[Crim. No. 1444.   Second Appellate District, Division Two.—April 18, 1927.]

## THE PEOPLE, Respondent, v. ROBERT McAFEE, Appellant.

[1] CRIMINAL LAW—ORDER DENYING MOTION IN ARREST OF JUDGMENT—APPEAL.—An order denying a motion in arrest of judgment in a criminal action is not an appealable order.

[2] ID.—INCEST—LEWD AND LASCIVIOUS CONDUCT—PHOTOGRAPH OF LOCALITY OF OFFENSE — PRESENCE OF CLOTH — EVIDENCE. — In a

2.   Photographs as evidence of scene of crime, note, 75 **Am. St. Rep.** 477.   See, also, 8 **Cal. Jur.** 136, 137.

prosecution for incest committed by defendant with his daughter and for lewd and lascivious conduct, no prejudice could have been occasioned by the mere introduction of a photograph of the locality where the crime was committed showing a cloth or handkerchief lying on the ground which the daughter testified was used to wipe away the blood following the attack by the defendant, where the cloth itself was excluded from evidence, and the trial court made it clear to the jury that the photograph was introduced merely as an additional picture of the locality, and the jury was permitted to view the scene of the offense.

[3] ID. — FINDING OF HANDKERCHIEF — PRESERVATION OF — IDENTIFICATION—EVIDENCE.—In such prosecution, there was no error in allowing a witness attached to the district attorney's office to testify to the effect that on his visit to the scene of the crime with defendant's daughter and the photographer he found at the point indicated in the photograph the handkerchief and some rags produced in court, and had kept them ever since in his custody at his office until they were delivered at the time of the trial to the district attorney, and that their condition had remained unchanged, as such identification was a necessary preliminary to the offer of the handkerchief in evidence.

[4] ID.—ADMISSIBILITY OF EVIDENCE—DISCUSSION BEFORE JURY—ABSENCE OF PREJUDICE.—In such prosecution, the fact that the discussion between counsel and court as to the admissibility in evidence of the handkerchief and the testimony of a doctor dealing with the characteristics of certain discolorations on the handkerchief was heard by the jury was not prejudicial to the defendant and a ground for reversal, where the trial court excluded both the handkerchief and the testimony of the doctor, and at the same time instructed the jury to disregard all the evidence in reference to the handkerchief.

[5] ID. — VIEWING OF SCENE OF OFFENSE — CONVERSATION BETWEEN CHILD AND PROSECUTOR—ABSENCE OF HARM.—In such prosecution, the defendant was not harmed by the circumstance that on the visit to the scene of the offense there was some private conversation between the defendant's daughter and the prosecuting attorney, where the prosecutor explained that he was merely asking the child something about the roadway and then suggested that she be allowed to alight from the bus occupied by the party and move about by herself so as better to locate the spot to which testimony had been directed, and the child was permitted to look about alone.

[6] ID. — DIVORCE — HOSTILITY OF DEFENDANT'S FORMER WIFE — EVIDENCE.—In such prosecution, the reception of evidence to the

---

3.  See 8 Cal. Jur. 142.

effect that defendant had been granted a divorce from his former wife, the mother of the child, for the purpose of showing her hostility, was sufficient to accomplish defendant's purpose, without retaining in the record his former wife's admission of the specific grounds of divorce.

[7] ID. — DISEASE — ORIGIN OF — EXCLUSION OF EVIDENCE. — In such prosecution, if an infection in the daughter was attributable to a diseased condition of the defendant in the year when the crime was committed, the definite origin of such condition was not material, and the trial court properly excluded evidence that his former wife herself had had venereal disease and that the divorce in his favor seven years previously was based on that circumstance, and that she had been treated for venereal disease.

[8] ID.—SUSTAINING OBJECTION TO QUESTION—FAILURE TO STRIKE OUT ANSWER—EFFECT OF.—In such prosecution, where in response to a question put by defendant's attorney to defendant's former wife on cross-examination, "Whenever you have wanted to cause the defendant here trouble, either in your married life or otherwise, you brought some charge like this against him, have you not?" the witness answered, "I certainly have not," the ruling of the trial court in sustaining the district attorney's objection made after the answer, without striking out the answer, was harmless.

[9] ID. — CONVERSATIONS BETWEEN DEFENDANT AND EX-WIFE — TIME OF—EVIDENCE.—In such prosecution, the trial court properly excluded from evidence testimony concerning details of conversations between defendant and his former wife after he was acquitted of an offense charged to have been committed against the sister of his former wife.

[10] ID. — FAMILY RELATIONS — CAUSE FOR BRINGING CHARGE — EVIDENCE.—In such prosecution, there was no error in sustaining an objection to a question put to defendant's former wife: "Do you know anything in the family relations that might cause Melba to bring a charge against her father in this nature without foundation"?

[11] ID.—ASSAULT UPON DEFENDANT—OBSTRUCTION OF JUSTICE—CONTEMPT—EVIDENCE.—In such prosecution, an assault by the husband of defendant's former wife made upon defendant during an overnight continuance of the trial not having occurred in the presence of the court, and no foundation having been laid for punishment for a contempt committed elsewhere, the court was not empowered to treat the attack as an attempt to obstruct justice.

[12] ID. — HOSTILITY — EVIDENCE. — In such prosecution, it was not error to sustain an objection to a question asked during the examination of defendant by his counsel as to what has been his daughter's attitude toward the stepmother, where the question was merely general in character, and if any pertinent instances of animosity existed there was nothing to prevent counsel

from adducing such evidence by more pointed questions, and where counsel could have made an offer to prove material facts or circumstances.

[13] Id.—Exchange of Notes Between Child and Other School Children — Insignificance of — Evidence. — In such prosecution, the mere fact of exchange of notes between defendant's daughter and other school children was insignificant, it not appearing that witnesses called to testify as to the exchange of such notes knew anything of the contents thereof.

[14] Id.—Pleading — Information — Incest — Lewd and Lascivious Conduct—Crimes.—In such prosecution, where the information contained four counts, the first count charging incest and the third lewd and lascivious conduct, both relating to the same occurrence, the lascivious conduct charged in the third count and found by the jury to have been practiced, having preceded the more serious offense charged in the first count, though ultimately relating to that offense, was nevertheless distinguished from it and formed a separate crime under section 288 of the Penal Code.

[15] Id.—Information—Pleading—Instructions.—Instructions stating to the jury in substance that an information may charge in separate counts two or more distinct offenses connected together in their commission, or different statements of the same offense, and that as regards the counts in the instant prosecution of incest and of lewd and lascivious conduct, the defendant, if found guilty, might be convicted on all, or any number less than all, of the four counts against him, and that while an information might legally include a combination of charges, yet the jury were not to infer from anything the court had said that they were to find the defendant guilty of any of the charges on which he was being tried, were correct statements of law.

[16] Id. — Refused Instructions — Subject Covered by Given Instruction.—In such prosecution, the defendant cannot justly complain of the failure to give two instructions asked by him, to the effect that the jury were to disregard matters ruled out by the court, and were not to construe objections made on behalf of defendant as attempts to suppress the truth, or prevent a full investigation of the facts, where an instruction was given answering all the purposes of those requested by defendant.

[17] Id.—Argument — Misconduct — Instruction. — In such prosecution, the conduct of the district attorney in referring in his

15. Joinder of two or more offenses in one indictment or information, note, 58 Am. Dec. 238. See, also, 14 Cal. Jur. 66, 67; 14 R. C. L. 196.

17. Method of curing error in argument, note, 9 Am. St. Rep. 569. See, also, 8 Cal. Jur. 623.

closing argument to the prior prosecution against defendant for
an alleged offense affecting the sister of defendant's ex-wife
was not sufficiently reprehensible to cause a reversal, where the
trial court, upon defendant's protest, forthwith directed the jury
to disregard what had been said, adding that it had nothing
to do with the case.

(1) 17 C. J., p. 34, n. 49.    (2) 16 C. J., p. 744, n. 11.    (3) 16 C. J.,
p. 618, n. 17.    (4) 16 C. J., p. 850, n. 51.    (5) 17 C. J., p. 287, n. 61.
(6) 17 C. J., p. 335, n. 10.    (7) 31 C. J., p. 383, n. 66.    (8) 17 C. J.,
p. 310, n. 97.    (9) 16 C. J., p. 636, n. 33.    (10) 40 Cyc., p. 2484, n. 69.
(11) 16 C. J., p. 806, n. 6.    (14) 16 C. J., p. 58, n. 86.    (15) 31 C. J.,
p. 389, n. 72.    (16) 16 C. J., p. 1063, n. 85; 17 C. J., p. 298, n. 22.
(17) 17 C. J., p. 299, n. 31.

APPEAL from a judgment of the Superior Court of San
Diego County and from an order denying a new trial.
S. M. Marsh, Judge. Affirmed in part; reversed in part.
Appeal from order denying motion in arrest of judgment
dismissed.

The facts are stated in the opinion of the court.

O. E. Mark for Appellant.

U. S. Webb, Attorney-General, and H. H. Linney, Deputy
Attorney-General, for Respondent.

JOHNSON, J., *pro tem.*—The defendant was charged
with the crime of incest with his daughter Melba, a child
of eleven years, on two occasions, the first about the begin-
ning of April, 1926, the second on June 19, 1926; and also
with the commission of lewd and lascivious conduct on each
occasion in violation of section 288 of the Penal Code.

The information on which the defendant was tried con-
tained four counts, the first and third relating to the occa-
sion in April, the second and fourth to that in June. He
was convicted on all four counts; but the attorney-general
concedes, justly, that the evidence does not support the con-
viction under the fourth count—that of lewd and lascivious
conduct in June—and that the conviction under that count
should be set aside. Attention will therefore be confined
to the grounds urged by defendant for a new trial as to the
other three counts.

In addition to his appeal from the judgment of conviction and the order denying his motion for a new trial, defendant has attempted to include an appeal from an order denying a motion in arrest of judgment. [1] Such order is, however, not an appealable order, and hence needs no further consideration.

Upon the trial the child testified at considerable length. It appears that the defendant had been twice married and that the little girl was the elder of the two children of defendant's first marriage, but had been living with the defendant and his second wife for about a year before the acts charged. There had been a divorce between defendant and the child's mother, who had also remarried and who at the time of the trial was known as Mrs. Nancy Morgan. According to the girl's story, the defendant about the beginning of April, 1926, invited her, upon her return from school one afternoon, to take a ride with him in his automobile to a rabbit farm near San Diego in order to procure some rabbits to bring home. When they reached a remote spot she testified that they alighted, and while sitting in a clump of bushes her father, after certain caresses, used his hands upon her in a lascivious way and afterward caused her to submit to sexual embraces, during which bleeding occurred. She testified further that to wipe away the blood a handkerchief or cloth produced by her father was used, and was then thrown upon the ground near by. On the occasion in June the child said that the occurrence took place in her father's automobile near the spot visited in April. Upon her return home after this trip, the suspicion of her stepmother being aroused, as Melba testified, by spots of blood upon her skirt, the child related what had happened. In July following a medical examination showed that she had at some time contracted gonorrheal infection.

Upon the appeal, stress is laid for the most part upon asserted errors in respect of the evidence. Six of defendant's specifications of such errors deal with the introduction of photographs of the alleged *locus* and the effort of the district attorney to introduce a handkerchief or cloth such as was referred to in the child's testimony. These particular specifications can be advantageously dealt with together.

The photographs were taken and identified by a photographer, Samuel S. Williams, who visited the scene on August 5, 1926, in company with the child and M. Quitsow, an assistant investigator in the district attorney's office. The photograph thought to be especially prejudicial to the defendant was one admitted in evidence as People's Exhibit No. 6, showing the cloth lying on the ground near bushes pointed out by the child—the same cloth which during the examination of other witnesses in court was presented to view, but not received in evidence. In admitting the photograph showing the cloth, the court said: "It may not have much significance, but it is another photograph of the vicinity in which it is claimed that one of these offenses took place; and whether the presence or absence of a cloth there is of any significance or not, I think perhaps the picture should be received." The statement of the judge made it clear to the jury that the photograph was introduced merely as an additional picture of the locality; and, moreover, at a later stage of the trial the jury, properly accompanied, was permitted to view the premises designated as the scene of the offenses charged. [2] In view of the subsequent action of the court, when the cloth itself was offered and excluded, no prejudice can have been occasioned by the mere introduction of the photograph. The same may be said of a photograph of a spot called "Dead Man's Hole," which does not appear to have had any bearing on the case.

[3] As to the cloth, it is contended that the court erred in allowing the witness Quitsow to testify that, on his visit to the spot in August with the child and the photographer, he found at the point indicated in the photograph the handkerchief and some rags produced in court, and had kept them ever since in his custody at his office until they were delivered at the time of the trial to the district attorney, and that their condition had remained unchanged. This identification was a necessary preliminary to the offer of the handkerchief in evidence, and there was no error in the allowance of such testimony.

[4] After the handkerchief had been thus identified, Dr. J. Francis White, a bacteriologist, was called to the stand. It developed that he had subjected the handkerchief to a laboratory test in order to determine the characteristics of certain discolorations which the district attorney described

as due to smears of blood and spermatozoa. After rather a lengthy colloquy in the presence of the jury, the court excluded both the handkerchief and the testimony of the doctor. At the same time the court instructed the jury to disregard all the evidence in reference to the handkerchief. Appellant insists, however, that the court was tardy in its ruling and that the discussion heard by the jury was grievously prejudicial, and constitutes ground for reversal. It is best, therefore, to quote at length from the record:

"Q. [By the prosecutor] : Did you subject that handkerchief, or any spots or stains upon that handkerchief, to any bacteriological experiment?

"Mr. Mark: Just a moment before you answer, Doctor. Objected to as incompetent, irrelevant, and immaterial, no proper foundation laid, assuming an investigation or examination not in evidence, having no connection with the case.

"Mr. Johnson: Now, if your Honor pleases, there has been testimony from the prosecutrix that at this time there was a handkerchief used. There was a handkerchief used or piece of cloth. She described it. She could not identify this particular cloth, but she did state there was a handkerchief used there, white, of a similar character as the object that was exhibited. She made the best identification that she could under the circumstances. She did state that she used that handkerchief and that there was blood on her person at that time, and that she wiped herself on it. She was wiped with that handkerchief. Now, then, we follow that up by showing that some months afterwards, within a radius of three feet of where that act took place, a handkerchief was found with certain stains upon it. Now, your Honor, I propose to follow this up by showing that this witness, an expert in that particular field, a bacteriologist, with years of experience, subjected that handkerchief to a certain test, subjected certain spots there to all of the tests that are known to science to-day, and that those spots upon that handkerchief are blood. Now, isn't that testimony material, relevant, competent? The mere fact that it was found there months afterwards—we propose to follow that up by the testimony of this physician, this expert, to show that it does not make a particle of difference, under certain circumstances, if an object of that character were exposed to the elements, these things would remain there yet,

these signs, after they are subjected to the experiments that are known, that science has led us to today, they can still be detected. That simply goes, of course, to the weight of the testimony, and not to its admissibility. If this was simply a handkerchief found here with spermatozoa on it, the human germ, seed, perhaps it would not be so strong. But here is the testimony of this prosecutrix. We have her testimony that she had never been violated before, that there was a penetration of her person on that spot for the first time, and that she had a hemorrhage. We follow that up by showing that on that spot, within three feet, we find a handkerchief with spots on it. These spots are subjected to a test known to science. And we have the expert testimony of a man that the spots show blood. Isn't that competent for the jury to determine? I say that the length, the duration, of time that intervened goes to the weight of the testimony, not to its admissibility. It is a question for this jury to determine, whether or not that was the handkerchief that she wiped herself with that time after she had been violated in the manner and form as she described in her testimony.

"Mr. Mark: That would be very well, your Honor, if we could follow that up with any known test. If the doctor can answer two questions for me, I will remove my objection. I want to ask him if he can tell whose blood it was and whose spermatozoa it was, and we will subject this man here, this defendant, to examination of all his vital fluids to determine that. If that can be done, I will withdraw my objection.

"Mr. Johnson: That is the most absurd suggestion I have ever heard in a court of justice.

"The Court: I think this is too remote. I think the testimony shows that, if this handkerchief were left there at all, it was along about the first of April of this year.

"Mr. Johnson: Yes, your Honor.

"The Court: And the testimony tends to show that it was found along about the 5th of August, or the early part of August, which would be four months later. After seeing that country, and the litter of things that were there, papers and cloths and tin cans and everything else, I think it is altogether too remote to be received in evidence.

"Mr. Johnson: Will your Honor permit me to take a recess for a time. I think I have one or two authorities on the proposition, if your Honor please.

"The Court: Of course, where it is a matter of remoteness, it is largely in the discretion of the court. In addition to that, there is a lack of identification.

"Mr. Johnson: Your Honor, the authorities hold remoteness must be an extreme proposition. It must go to such an extent that there is not the remotest possibility of there being any connection between them. The remoteness under all the circumstances goes to the weight of the evidence and not to its admissibility. That's a settled rule in this state, your Honor.

"The Court: Yes, that is true.

"Mr. Johnson: And I am satisfied I can show your Honor one or two authorities where matters which would ordinarily be considered very remote from the issue involved have been held admissible by the Supreme Court of this state. I consider this testimony one of the most vital pieces of testimony in this important criminal prosecution, your Honor. Here is the sworn testimony with reference to where this thing was found.

"The Court: Four months later.

"Mr. Johnson: Yes, your Honor, the peculiar significance of it is that there was testimony from this prosecutrix that she wiped herself with it.

"The Court: No; not with *it*. There is no testimony to that. If there were, I should admit it. That is, when you say 'it,' you refer to this particular piece of cloth or handkerchief.

"Mr. Johnson: That she used it? I so understood the testimony, your Honor.

"The Court: She used *a* cloth.

"Mr. Johnson: That she used *a* handkerchief, yes.

"The Court: Or a handkerchief. If you had identified it as being the one that was there on the first of April, then it would not be nearly as remote.

"Mr. Johnson: Yes; but it is almost impossible to identify a handkerchief unless you have got a monogram upon it, or something of that sort.

"The Court: That is the difficulty.

"Mr. Johnson: He said it was a white object and had the same general appearance of this handkerchief.

"The Court: There are many, many things that could make it less remote. If that were way off from human habitation, where very few people went, or anything of that sort; but we all saw the nature of the country there.

"Mr. Johnson: Yes, your Honor, we did. We all saw that little hollow place there, that sort of cave in those trees, your Honor; and this handkerchief is found, as the witness Quitsow has said, within an area of three feet. That was about the only object that was in there.

"The Court: I think there perhaps is some discrepancy in the testimony as to where that was found. One witness testified to three feet, but I think another testified it was much further than that. But taking into consideration the nature of the country, taking into consideration the fact that this was not identified at all as the handkerchief that was used there, taking into consideration the nature of the country in general, I think it is altogether too remote to be admissible. As has been suggested here, if this could be identified as the blood of the defendant, or something of that sort, that would be entirely different.

"Mr. Johnson: I do not know how we are going to identify the blood on this handkerchief as the blood of the accused. It is humanly impossible.

"The Court: Surely; but it does not necessarily follow that I must admit it because it is impossible to get any better evidence, the mere fact that it is a difficult thing to prove.

"Mr. Johnson: Your Honor, I feel this matter is of such importance that I want to—

"The Court: We will not take any more time for it now. I will sustain the objection for the present. If you find any authority between now and tomorrow morning that you want to submit to me, I will be glad to see it.

"Mr. Johnson: Yes, your Honor.

"The Court: But ordinarily the different circumstances make cases so different that it is a little difficult to find an authority which would be a parallel case to this. The objection sustained.

"Mr. Johnson: I will try to find some authority on it before tomorrow morning.

"Mr. Mark: Then, your Honor, may we repeat our request that since this handkerchief in question has been paraded before the jury with hints and insinuations—

"Mr. Johnson: What kind of insinuations?

"Mr. Mark: Hints and insinuations, they be instructed to disregard it?

"The Court: Yes. The jury is instructed to disregard all the testimony with reference to this handkerchief in connection with this case."

The court's cautious treatment of the matter could have left no doubt in any juror's mind that the court deprecated the evidentiary value of the handkerchief. Again and again the court pointed out that there was no identification of the handkerchief produced with any handkerchief actually used, while the circumstances under which the handkerchief was found, together with the lapse of four months' time, left its connection with the case too remote to justify its use as evidence against the defendant. The remarks of the court during the lively interchange of counsel, followed by the express admonition to cast out all testimony bearing on the handkerchief, cannot have failed to impress upon the jury that they were to banish from their minds all references to the handkerchief. Under these circumstances the zeal of the district attorney in endeavoring to convince the court of the propriety of the evidence offered cannot be deemed ground for reversal.

[5] In connection with the visit of the jury to the premises mentioned in the child's testimony, complaint is made that there was some private conversation between the little girl and the prosecuting attorney. The attorney for the defendant, assuming some undue suggestion to have been made, insisted that the prosecutor was coaching the witness. The prosecutor explained, however, that he was merely asking the child something about the roadway, and then suggested that she be allowed to alight from the bus occupied by the party and move about by herself, so as better to locate the spot to which testimony had been directed. In response to a question by the judge, the child said she thought it would help her if she could look about alone, and this she was then permitted to do. The circumstance complained of could not have done defendant any harm. The viewing of the location was not conducted strictly in accordance

with section 1119 of the Penal Code, but no objection based on nonconformity with the section was made, nor was any prejudice suffered.

[6] Another set of specifications of error deals with the exclusion of certain evidence bearing upon the family relations between defendant and his first wife, Mrs. Nancy Morgan, and the relations also between the child and the defendant's second wife, Mildred McAfee. Defendant, insisting upon his innocence, contended that the charges against him were instigated by his former wife, the child's mother, who had sworn to the warrant for his arrest. In the examination of Mrs. Morgan there was an effort on two occasions to show that seven years previously the defendant had obtained a divorce from her on the ground of her adultery. While the court in each instance sustained an objection to inquiry concerning the grounds of the divorce, and each time struck out the answers of the witness when, notwithstanding the rulings, she answered the question affirmatively, yet in response to other questions the fact of a divorce in favor of the defendant was brought out by his attorney. The purpose of the questions was to show hostility of the defendant's former wife. In connection with considerable other testimony directed to the same end, defendant's purpose was sufficiently accomplished by the allowance of evidence of a divorce granted to the defendant, without retaining in the record Mrs. Morgan's admission of the specific grounds.

[7] While the defendant and his first wife were living together, according to the testimony given by her, the defendant told her that he had contracted gonorrhea. This was denied by defendant, and there was an attempt to show that the wife herself had had venereal disease and that the divorce in the husband's favor seven years previously was based on that circumstance. Such evidence was excluded, and likewise evidence designed to prove from clinical and police records that Mrs. Morgan had been treated for venereal disease. She herself admitted that while the wife of defendant she "did take treatments to keep from getting it." Though the presence of some old infection in the defendant was an issue in the trial, the defendant in his testimony told his own story about his relations with his former wife, and produced also as a witness Dr. Compton, who stated that an examination made by him of the defendant in

August, 1926, showed no trace of venereal disease or of prior infection. If infection in the daughter was attributable to a diseased condition of the defendant in the year 1926, the definite origin of such condition was not material, and the court properly kept the trial within the bounds of the real issue between the People and the defendant.

[8] Again, while Mrs. Morgan was under cross-examination, she was asked by defendant's attorney whether she had been the complaining witness in a former prosecution of defendant for some offense involving Mrs. Morgan's sister. In the course of this inquiry this question was put: "As a matter of fact, Mrs. Morgan, whenever you have wanted to cause the defendant here trouble, either in your married life or otherwise, you brought some charge like this against him, have you not?" The answer was: "I certainly have not." The district attorney objecting after the answer, the court sustained the objection, but did not strike out the answer. Clearly the ruling was harmless.

[9] Officer John A. Kane, who arrested defendant under the warrant herein, testified that on the way to the station defendant had said that his former wife was to blame for the arrest, and that a couple of years previously she had tried "to frame him" in some matter affecting her sister. Later when defendant was a witness in his own behalf, he corroborated the testimony so given by Kane; but when effort was made to question him about details of conversations between himself and Mrs. Morgan after he was acquitted of the offense charged to have been committed against her sister, the court sustained an objection on the ground of immateriality. Defendant's declaration to Kane as well as his own testimony on the same subject were purely self-serving, and not really admissible in evidence. The court was therefore right in closing the door to additional testimony of like sort.

[10] Error is also predicated on the sustaining of an objection to the question put to Mrs. Morgan: "Do you know of anything in the family relations that might cause Melba to bring a charge against her father of this nature without foundation?" Objection having been sustained, the inquiry was not pursued further. There was no error in the ruling.

[11] During an overnight continuance of the trial the defendant, while outside of the courthouse, was attacked by

the husband of Mrs. Morgan, his face bruised and his lip cut. In a conference the following morning in the judge's chambers, defendant's attorney charged that Mrs. Morgan had been threatening witnesses, and had threatened many times to have her husband beat the defendant unless the latter turned over to her certain property. It was further stated that in the police court that morning Morgan had been fined fifty dollars, with the alternative of twenty-five days' confinement in jail. The discussion in chambers ended with the following understanding between the court and counsel:

"Mr. Mark: Then may the record show that the counsel for the defendant requests the court for permission to explain the presence of a wound upon the face of the defendant, which was not there yesterday, and which appears to be there this morning, in order to relieve him from any implication of wrongdoing that might get into the minds of the individual jurors? Also let the record show that counsel for the defendant requests the court for permission to state the reasons why certain witnesses, to-wit: Joe Martinez and Augustine Brown, are not to be called to the stand, altho referred to in previous testimony, the reason for their not being called being that threats against their lives have been made by the present husband of the ex-wife of the defendant? I presume the request will be denied.

"The Court: I will have to make that ruling—you will have to make your offer, ask questions, not make any statement, and I will have to make my ruling out there.

"Mr. Johnson: We resist the application, of course.

"Mr. Mark: Just how far, now, do you want me to go, for the purpose of the record? That is all. I want to follow the suggestion of the court.

"The Court: You may ask any question, but not make any offer, any statement, as to what you expect to prove.

"Mr. Mark: You mean ask questions of the court?

"The Court: No; ask questions of the witness.

"Mr. Mark: I see. Then I will put the young fellow on the stand. In the meantime I am serious about that proposition of protection.

"The Court: That will have to be done in a separate proceeding. There is a statutory provision.

"Mr. Johnson: Certainly, your Honor. And, moreover, your Honor, I told this man, when he came in there last night—not when he came in there last night, but when that alibi witness, or the first witness that took the stand, came in there—who is a special deputy, without any powers of serving criminal process, however, without permission from the sheriff—just simply a special deputy out in the back country—I told him that I did not want to have anything occur that would prejudice this case, at this time. I told him and the accused in that particular case—this woman's husband promised me to be in the courtroom—in the district attorney's office this morning at nine o'clock—I told this man if they wanted any redress in our office they could have it, but I did not want this case prejudiced; as soon as the case was concluded, which would be in the next twenty-four hours, if they wanted a complaint, action could be had in our office. That is what I told them. So they wait until about ten o'clock last night and then come down and procure a warrant for him; and the case is heard at 8:30 down there in the justice court, and he is given no opportunity to defend himself whatsoever, had no testimony there.

"The Court: You see, we do not want to try out that other case in with this.

"Mr. Johnson: No. In so far as the testimony is concerned, there is just as much information in my hands that this man McAfee has threatened the life of his wife and the girl and that he ought to be put under peace bonds. I have all kinds of evidence in the district attorney's office there.

"The Court: We do not want to go into either side of it; it is too complicated, too long."

The matter seems not to have been adverted to in any of the subsequent proceedings in court, and there is nothing in the judicial attitude of the court in reference to the unfortunate occurrence to justify criticism. The assault not having occurred in the presence of the court, and no foundation having been laid for punishment for a contempt committed elsewhere, the court was not empowered to treat the attack as an attempt to obstruct justice, as defendant seems to think was obligatory,

[12] During the examination of defendant he was asked by his counsel: "What has been Melba's attitude toward

Mildred [the stepmother] ?'' Objection to the question upon the ground that it was ambiguous and not germane to the issue was sustained; and this ruling is assigned as error. The question was merely general in character; and if any pertinent instances of animosity existed, there was nothing to prevent counsel from adducing such evidence by more pointed questions. So, also, counsel could have made an offer to prove material facts or circumstances.

[13] For the purpose, apparently, of showing some association between defendant's daughter and boys at the same school with her, a schoolmate, Leslie Webb, was called as a witness by defendant and asked whether he had carried notes between the girl and a boy named Joe Martinez. Mrs. Gladys Webb was asked also whether she knew of such notes being exchanged between those children at school. Objections to such questions were in each instance sustained. It did not appear that either witness knew anything of the contents of such notes, if any; and the mere fact of the exchange of notes between school children is insignificant in this particular case.

The remaining assignments of error relate to instructions given or refused. Exception is taken to instructions stating to the jury in substance that an information may charge in separate counts two or more distinct offenses connected together in their commission, or different statements of the same offense, and that as regards the counts in this case of incest and of lewd and lascivious conduct, the defendant, if found guilty, might be convicted on all, or any number less than all, of the four counts against him. The court further instructed the jury that while an information might legally include a combination of charges, yet they were not to infer from anything the court had said that the jury were to find the defendant guilty of any of the charges on which he was being tried.

[14] As regards the first and third counts, relating to the April occurrence, the lascivious conduct charged in the third count, and found by the jury to have been practiced, preceded the more serious offense charged in the first count; and though ultimately relating to that offense, was nevertheless distinguished from it and formed a separate crime under section 288 of the Penal Code.

[15]   As to the second and fourth counts, relating to the occurrence in June, the verdict on the fourth count is concededly without support. But the court was not asked to direct a verdict for the defendant on that count or any other, and the instructions complained of are correct statements of law.

[16]   Complaint is made further of the failure to give two instructions requested by defendant, to the effect that the jury were to disregard matters ruled out by the court, and were not to construe objections made on behalf of defendant as attempts to suppress the truth, or prevent a full investigation of the facts. The court did, however, give the following instruction: ''While you are the sole and exclusive judges of the facts and of the weight of the evidence, you are to judge of the facts upon the testimony and other evidence produced here in court. If any evidence has been admitted and afterwards stricken out, you must disregard the matter so stricken out, entirely. And if any counsel has intimated, by questions which the court has not permitted to be answered, that certain things are or are not true, you must disregard such questions and refrain from any inferences based upon them. If counsel upon either side have made any statements in your presence concerning the facts in the case, you must be careful not to regard such statements as evidence, and must look entirely to the proof in ascertaining what the facts are.'' The instruction so given answered all the purposes of those requested by defendant.

Finally, it is urged that defendant was deprived of a fair trial by reason of alleged misconduct of the district attorney. In this respect reference is made to the persistent effort of the district attorney to have the handkerchief received in evidence; and attention is directed also to some heated remarks made during the trial by the prosecutor in discussion with defendant's attorney, wherein the latter was charged with lack of good faith in opposing an attempt to show Mrs. Morgan's friendly attitude toward defendant during his prosecution for the alleged offense affecting Mrs. Morgan's sister. That discussion ended when the court declared it out of order, stating at the same time that the matter had nothing to do with the case in hand.

[17] In the closing argument to the jury the district attorney went somewhat outside the record in referring to that prior prosecution. Defendant's counsel at once interrupted with a protest, whereupon the district attorney admitted that he was "overcharged," and the court forthwith directed the jury to disregard what had been said, again adding that it had nothing to do with the case. Under such circumstances the conduct criticised was not sufficiently reprehensible to cause a reversal.

The defendant was ably defended; and while he stoutly denied guilt, the conflict in the evidence was resolved against him by the triers of the facts, after a trial lasting five days which was guided throughout with fairness and moderation by the court.

On the record as a whole, the order denying defendant's motion for a new trial and the judgment of conviction are affirmed as to the first, second, and third counts of the information; and as to the fourth count the order denying defendant's motion for a new trial and the judgment of conviction are reversed. The appeal from the order denying defendant's motion in arrest of judgment is dismissed.

Works, P. J., and Craig, J., concurred.